New-York Special Term, June, 1848.   *Hurlbut,* Justice.

Brower and others *vs.* The Mayor, &c. of New-York.

As a lawgiver, a municipal corporation is irresponsible, and the courts cannot interfere with its police regulations, which are ordained as laws for the observance of the citizen. But courts can enforce the obligation which rests alike upon owners of land, whether corporations or individuals, so to use their property as that adjacent proprietors shall be rendered secure in the enjoyment of their estates.

The corporation of the city of New-York has no more right to erect and maintain a nuisance, on its lands, than a private person possesses.

Brower *v.* The Mayor, &c. of New-York.

A court of equity has jurisdiction to restrain the corporation of the city of New-York from permitting a portion of its property to be used in such a manner as to endanger the health and lives, or seriously to impair the comfort, of persons residing in the vicinity of such property ; and to restrain its lessees from so using it.

In Equity. This was an application for an injunction. The bill was filed by persons owning and occupying property situate in the fifth ward of the city of New-York, in the neighborhood of the place called the north battery, on the North river, at the foot of Hubert-street. The bill stated that the section of the city in which the north battery was situated had been improved by the erection of dwelling houses, mostly of a costly description, and that the same were chiefly occupied for dwellings, by persons doing business in other parts of the city. That by an act of the legislature of this state, passed on the 7th of April, 1848, the commissioners of emigration were authorized, with the approval and consent of the common council of the said city, to lease or purchase suitable docks or piers to be appropriated or set apart for the exclusive use of landing emigrant alien passengers ; that such common council, on the 8th of May, 1848, passed a resolution that the north battery be granted to the said commissioners of emigration for the landing of immigrants, for a period of five years ; that the commissioners of emigration had taken, or were about to take, such lease, and were proceeding to make the necessary erections, and to prepare the premises for the uses aforesaid ; that the said piece of ground had been, and then was, used for the purposes of a public street or highway, but that the commissioners of emigration proposed and intended to enclose the same, and wholly destroy the use thereof as a public street or highway, and to appropriate the same exclusively to the landing and receiving thereon, and discharging therefrom, all the emigrant passengers who should arrive at the port of New-York, with their baggage and effects ; that they proposed to erect thereon sheds, &c. for the purpose of sheltering and protecting such emigrants as might require temporary shelter and protection before being discharged. That the number of emigrant passengers arriving from foreign countries at the port of New-York,

during the summer months, and in the early part of autumn, exceeded, in the average, one thousand persons each day, and on some days three thousand; that the emigrant passengers who had hitherto arrived at the port of New-York had heretofore been landed at various points upon the East and Hudson rivers, upon lines of wharves and piers extending at least three miles about said city; that the emigrant passengers who had heretofore arrived at the city, especially within the last two years, had been extensively affected with contagious, malignant and dangerous diseases, and had constantly introduced into the city, and communicated to its inhabitants, infectious diseases of a malignant and dangerous character, and were daily doing so. That under the arrangement proposed to be made by the corporation with the commissioners of emigration, for landing all the emigrant passengers at the foot of Hubert-street, the pestilence would be contracted and thrown upon the fifth ward, and would fall with unmitigated severity upon the blocks of ground situate within a quarter of a mile of the north battery; that the occupation of the north battery for the purposes proposed would endanger the health and lives of the persons residing in the vicinity; and that the dwelling houses in the neighborhood would be rendered wholly untenantable as private residences, and the value thereof be greatly diminished; and that the value of St. John's Park would be wholly destroyed as a park, and all the large investments made therein be sacrificed to the parties owning the same. That the tenants in some of the houses occupied in the vicinity, belonging to some of the plaintiffs, had threatened to leave the same if the nuisance should be established. That the premises owned or occupied by the plaintiffs, respectively, would be injuriously affected by the use of the north battery for the purpose proposed, and that the plaintiffs would suffer great and irreparable damage by the leasing of the premises to the commissioners. The bill then prayed that the common council might be restrained, by injunction, from leasing the north battery to the commissioners of emigration, to be used for the purpose of landing or keeping emigrant passengers, or their baggage or effects, or allowing

or permitting the said premises to be used or occupied for that purpose; and that the commissioners of emigration and their successors, agents, &c. might be in like manner restrained from thus using or occupying the premises.

*E. Sandford,* for the plaintiffs.

*Willis Hall,* for the defendants.

HURLBUT, J.　The premises known as the north battery, are owned by the mayor, aldermen and commonalty of the city of New-York, and while as such owners, they enjoy, in respect to this property, all the rights to which private persons would be entitled, they are subject also to the same duties and obligations in respect to others owning adjacent lands, that the law imposes upon private persons owning real estate.

That the premises in question are held as a public trust, and that no private gain or profit is to be derived from their possession, does not in the least diminish, or vary, the duties and obligations of the common council, in respect to adjacent owners, whose rights may be injuriously affected by a particular mode of using this property.　The great injunction of the law, addressed to all proprietors of real estate is, "*so use your own, as not to injure another;*" and a municipal corporation owning lands is as much bound to the observation of this precept, as a private person.

The citizen, and the municipal body, in respect to their several possessions of real estate, stand upon a footing of equality; neither is a privileged owner, and each must fulfil the same duties in respect to the other.　These duties arise out of, and are attached to, the ownership of the estate.　In the owning of title to land, a municipal corporation exercises not a public, but a private function.　It is what every citizen is competent to do, and what binds him to perform the obligations of a proprietor.　The idea of the irresponsibility of such a corporation, or their lessees, which was urged by the learned counsel for the defendants, can only be entertained by the courts, where the

Brower *v.* The Mayor, &c. of New-York.

corporation is in the exercise of a purely governmental function; as when it is either declaring a law in a legislative capacity, or in a ministerial one, executing it, without injuriously affecting the property or the rights of particular persons. Wherever it may rightly declare a duty, prohibit an act, or enforce an obligation in a governmental capacity, there the municipal corporation, in respect to the thing done, acts instead of the state, and in a sovereign character, and so may be held to be irresponsible. But in these cases, the municipal body stands above, and is superior to, the citizen. Its relation to him is that of the governor to the subject, and it exercises a function which he cannot assume. It does not descend to his level, nor invade the humble walks of business, nor deal in property or things physical. It ordains law, and exacts obedience. As a lawgiver, a municipal corporation is irresponsible, and the court cannot interfere with its police regulations, which are ordained as laws for the observance of the citizen. But it can enforce the obligation which rests alike upon owners of land, whether corporations or individuals, so to use their property, as that adjacent proprietors shall be rendered secure in the enjoyment of their estates.

The corporation of the city of New-York has no more right to erect and maintain a nuisance on its lands, than a private person possesses.

This brings me to the consideration of the position of the commissioners of emigration, in respect to the proposed use of the north battery. They are to be regarded as lessees of the common council of the city, of the premises in question, and in that character alone, are subject to the same duties and obligations as their lessors, in respect to adjacent proprietors. But it is claimed that they are irresponsible; that they are acting under legal authority; that they have a right, in their discretion, to locate these docks and piers at the north battery, and that in the discharge of this public function, they are not responsible to private persons for their acts. It is true that they exercise functions conferred by law, some of which may be properly regarded as public; and that in respect to the subject of

complaint in this case, they are authorized by the statute of 11th April, 1848, to lease or purchase suitable docks or piers in the city of New-York, and to erect necessary enclosures thereon, and to appropriate them for the exclusive landing of emigrant alien passengers, first obtaining the approval and consent of the common council of the city. This law does not designate any particular dock as the fittest for the use of the commissioners, but leaves them free to select any suitable one, in any part of the city, in which it must have been known to the legislature, docks could be procured which are far removed from the densely settled portions of the town. The mere legislative license to procure a dock and use it for a particular purpose, when the location of it at one place would be a nuisance, and in another it would not, cannot be construed as an authority to locate the dock at the former place. It is not pretended, that beside the north battery, there is no other suitable place in the city, where emigrant passengers can be landed; nor even that that place is more convenient for the purposes of the commissioners than any other; and it seems to me that it cannot be claimed by the commissioners, that either by particular authority of law or by the necessity of the case, they have a right to insist on a location at the place in question, without respect to the rights of the adjacent proprietors.

The commissioners of emigration, in respect to the possession of docks and the landing of passengers, may also be properly regarded as exercising a private function. The keeping of accommodations for this purpose is no more a governmental act, than the transportation of the same passengers across the sea; and as well might a ship authorized to carry a particular number of emigrant passengers, under statutory regulations, claim to be exempt from all responsibility for running down another ship on her passage, or for landing and exposing passengers in public thoroughfares, who were sick of dangerous and contagious diseases, as the commissioners of emigration in the present case. If the hand of government is to be seen in the employment of a dock by them, it is that of a goverment engaged in the ordinary transactions of the citizen, owning land

Brower *v.* The Mayor, &c. of New-York.

and devoting it to the common purpose of business; and its agents are to be held responsible, according to the grade of the function which they execute; rather than irresponsible on account of the supremacy of their principal. " If a state embark in the business of a trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen." (*Bank of U. S.* v. *The Planters' Bank of Georgia,* 9 *Wheat. Rep.* 904.)

It seems to me to be competent for this court to interfere for the purpose of preventing such an use of the north battery, by the owners and lessees of it, as would endanger the health, or seriously impair the comfort of the inhabitants of that vicinity; and the remaining question is, whether a case has been presented which demands the interposition of the court by way of injunction?

The bill states that it is the design of the commissioners of emigration to land and receive at the place in question, all the emigrant passengers who may arrive from foreign countries at the port of New-York, and to erect there sheds and other buildings for their shelter and protection; that the number of such passengers, arriving at this port during the summer months, may be from one to three thousand a day; that such passengers have for two years past been extensively affected with contagious, malignant and dangerous diseases, and that notwithstanding all the precautions exercised at quarantine, under the supervision of the health officer, and by the commissioners of emigration, these passengers have constantly, within the last two years, introduced into this city, and communicated to its inhabitants, infectious diseases of a malignant and dangerous character, and are now daily introducing and communicating such diseases; that the extent to which these diseases have been introduced, and the number of cases in which the same have been taken by residents of this city with fatal consequences, have been so great, as to cause extensive and general alarm among the inhabitants of this city; that by landing all the emigrants at the north battery, all the inhabitants in the immediate vicinity, among whom are the plaintiffs, will be

subjected to the danger of contracting the diseases of small pox, and ship fever, which would fall with great severity upon the residents in certain blocks of ground, within the distance of one-fourth of a mile from the landing; that this portion of the city is densely peopled, the buildings there being principally occupied as residences for families; and that there are also expensive improvements in that vicinity, and one, the St. John's Park, is private property, owned by and improved at the expense of the proprietors of the adjoining lands. That if the emigrant passengers shall be landed at the place proposed, the dwelling houses occupied by families in the vicinity thereof, in Hubert, Beach, Laight, Vestry, Desbrosses, and Watts streets, and in Washington, Hudson and Greenwich streets, will be rendered untenantable as private residences, and the value thereof greatly depreciated; and that the health and lives of the plaintiffs, and the inhabitants of that part of the city, would be greatly endangered, during the summer months, by the landing of emigrant passengers at the place proposed by the commissioners. The bill is supported by evidence tending to establish these facts, and in respect to the influence of the proposed use of the dock in question upon the health of its inhabitants in that part of the city, a great number of the most respectable members of the medical profession in this city, have certified that in their opinion it would be dangerous to the health and lives of such inhabitants. The affidavits read on the part of the defendants, do not, in my judgment, materially change the case presented by the bill. On the whole, it appears to me that the proposed use of the dock at the north battery, by the commissioners of emigration, would be dangerous to the lives and health of the plaintiffs and other inhabitants in that vicinity, and that it is as much the subject of restraint by this court, as unwholesome trades, slaughter houses, or operations dangerous to health or oppressive to the senses, conducted in the midst of dense masses of population. Therefore an injunction must issue, according to the prayer of the bill.